*Philadelphia,*
*Monday,*
March 29.

GRIFFITH *against* The Insurance Company of North America.

A warranty that a vessel is an *American bottom,* means that she is owned by a citizen of the *United States,* and is furnished with the usual documents required by our laws and treaties with foreign nations, so as to protect her from capture by any of the belligerents; but not that she is *American* built, or is an *American registered* vessel. *Hence* if she is *American* owned, and sails under a *sea letter* merely, the warranty is true.

THIS was an action of covenant upon a policy of insurance dated the 8th of *July* 1797, for 9500 dollars, on a quantity of indigo on board the Brig *Rosina*, at and from *New Orleans* to *Philadelphia*, *New York* or *Baltimore*, at a premium of ten per cent. The policy contained the following warranty. " The insured warrants the above goods to be " *American* property, *and that the vessel is an* American bot- " tom, proof whereof shall be required in the city of *Philadel-* " *phia* only."

Upon the trial of the cause before the Chief Justice in *February* last, it was admitted that a certain portion of the indigo was on board the *Rosina*, and belonged to the plaintiff and his partner, since deceased, citizens of the *United States;* that the vessel foundered on her voyage to *Philadelphia*, and that there was an abandonment and demand of payment on the 14th of *November* 1797. It was proved at the same time, that the brig at and before her departure and loss, was the property of *William Davy*, a citizen of the *United States*, and sailed under a *sea letter*. Upon these facts, it was agreed that a verdict should be taken for the plaintiff for 5694 dollars 98 cents, subject to the opinion of the Court in bank, whether the warranty of *an American bottom* had been broken.

The question was elaborately argued at this term, by *Gibson* and *Dallas* for the plaintiff, and *Hopkinson* and *Levy* for the defendants; the former contending, that by the laws of the *United States* and their treaties with foreign powers, a *sea letter* vessel, was entitled to the same respect and protection on the high seas, and in reference to the law of nations, as a vessel *American* built and registered; and that the privileges conferred by a register, were purely of a domestic kind,

which did not enter into the contemplation of insurers: that the vessel being entitled by a sea letter to all the privileges of an *American* vessel, must therefore be considered as an *American* bottom, according to the intention of the parties, and the true construction of the warranty.

**1813.**

GRIFFITH
*v.*
INS. COMPANY
of
N. AMERICA.

The defendant's counsel on the other hand argued, that an *American bottom* meant a vessel *American* built and registered, a vessel of the first grade; and that a *sea letter* did not insure to her all the protection and advantages that it was the intention of the warranty to provide, particularly at the time of this insurance.

The argument turned exclusively upon acts of Congress and treaties, which are very fully stated in the Court's opinion.

TILGHMAN C. J. delivered judgment.

This is an action on an insurance upon goods on board the brig *Rosina*, on a voyage from *New Orleans* to *Philadelphia*. The policy is dated the 8th of *July* 1797. The insured warranted the goods to be *American* property, and that the vessel was an *American bottom*. It was proved that the brig was the property of *William Davy* a citizen of the *United States*, that she sailed under a *sea letter*, and was not a registered vessel. The loss was admitted, and it was admitted also, that the goods were *American* property. The only question is then, whether a vessel owned by a citizen of the *United States*, not registered, but sailing under a *sea letter*, is an *American bottom* within the warranty. An *American bottom*, strictly speaking, may be said to be a vessel built within the *United States*. But that cannot be the meaning of the warranty, which was intended for the benefit of the insurers. A ship may be built in *America*, and owned by a foreigner, a subject of one of the belligerent potentates. In that case she would derive no protection from the circumstance of being built in the *United States*. On the other hand, a vessel may be built in foreign parts, and owned by a citizen of the *United States*, under circumstances which would entitle her to every privilege *within* the *United States*, and every protection *without*, which can belong to a vessel built in the *United States*. The warranty must be construed therefore, to mean a vessel owned by citizens of the *United States*, and furnished with the usual documents, required by our law and treaties with foreign nations, so as to protect her from capture

1813.

GRIFFITH
v.
INS. COMPANY
of
N. AMERICA.

by any of the belligerents. Something has been said, in the argument of this cause, of a distinction between the terms *American vessel*, and *American bottom*, but I consider them as synonimous. There are two kinds of *American* vessels, registered and unregistered. The former are entitled to greater privileges *within* the *United States* than the latter, they pay less tonnage, and the goods imported in them pay less duties. The counsel for the defendant contended in the first place, that the words of the insured are to be taken most strongly against himself, and therefore a registered vessel, which is entitled to the highest privileges, must be intended. This is pushing the matter too far. Where words are doubtful, they are to be taken most strongly against the speaker. But not so, where they are sufficiently clear. There being two kinds of *American* bottoms, if I engage that a certain vessel is an *American* bottom, *generally*, my engagement is complied with, if she is an *American* bottom of either kind, unless it can be shewn that such construction involves consequences at variance with the object of the agreement. We are then to consider the object of this warranty. It was to insure to the underwriters that protection to which neutrals are entitled. Now if this object is answered without a register, and if the use of a register is principally to obtain privileges of a domestic nature, there is no ground for asserting that the warranty contemplated a *registered* vessel exclusively. But if, as has been argued by the defendants, an unregistered vessel, though owned by citizens of the *United States*, was at the time of this insurance unprotected by the government, and deprived of those documents to which foreign nations look, as proof of neutrality, then indeed there will be strong reason for saying that the warranty required a registered vessel. It is necessary therefore to examine what was the situation of a vessel sailing under a *sea letter*, at the date of this insurance. A good deal will depend on ascertaining with precision the nature of a sea letter, concerning which there has been a considerable difference of opinion, occasioned principally, as it appears to me, by confounding it with a different instrument, called *a certificate of ownership*. It is provided by the 25th article of our treaty with *France*, that the ships and vessels of the people of both nations, shall be furnished with *sea letters or passports*. From this expression it seems that a sea letter and a passport were considered as the

same. I presume that during the revolutionary war, our vessels were furnished with this document according to treaty. During the peace that succeeded, it is probable that it was omitted, as there was no danger of capture. But when war broke out again between *France* and *England*, it became a matter of importance that our vessels should be so documented, as to afford them protection in their navigation. Accordingly we find that the attention of our government was very early turned to this subject. In a circular letter from the secretary of the treasury to the several collectors, of the 13th of *May* 1793, he mentions the necessity of furnishing " all " ships and vessels belonging to *citizens of the United States*, " with *sea letters*, for their more perfect identification and " security." This letter was accompanied with sea letters according to the form prescribed by the government, and not materially different from that which had been used in the revolutionary war. It is under the hand of the President, and seal of the *United States*, countersigned by the secretary of state, and contains the name and burthen of the vessel, with the nature of her cargo, the name of her master and the voyage on which she is bound, with permission to depart and proceed on the voyage. It contains also a declaration that oath has been made by the master, proving the vessel to be the property of citizens of the *United States* only. Underneath the signature of the secretary of state, is a certificate signed by the collector of the port from whence the vessel sails, that oath has been made before him by the master, that the said vessel is owned by citizens of the *United States* only. This certificate is addressed to all foreign kings and potentates, and prays that the said master may be received and treated with kindness and friendship &c. This sea letter being furnished to all vessels, *registered or unregistered*, belonging to citizens of the *United States*, afforded the same protection to both. It was a passport within the meaning of our treaties with *France, Spain, Holland* &c., nor have we any reason to suppose that its efficacy was called in question by either of them. Lord *Alvanley* appears therefore to have been mistaken, when he said in the case of *Baring &c.* v. *Clagett,* 3 *Bos. & Pull.* 213., that our unregistered vessels were not protected from capture by our treaty with *France.* It is true that by the registering act of the 31st of *December* 1792, it is declared that none other than registered vessels " should be

1813.

GRIFFITH
*v.*
INS. COMPANY
of
N. AMERICA.

"denominated and deemed vessels of the *United States*, en-"titled to the benefits and privileges appertaining to such "vessels." But those benefits and privileges were of a muni-cipal nature, with which foreign powers had no concern. On the 1st of *June* 1796, an act was passed directing the secre-tary of state, with the approbation of the president, to pre-pare a form of *passport* for *ships and vessels of the* United States going to foreign countries. And by a supplement to this act, passed the 2d of *March* 1803, every *unregistered* ship or vessel, owned by citizens of the *United States*, and sailing with *a sea letter*, going to any foreign country, is en-titled to one of the passports created by the original law. Hence it has been concluded by the counsel for the defen-dants, that unregistered vessels were unprovided with a pass-port during the interval between the passing of the acts of *June* 1796 and *March* 1803; that they carried in fact nothing but a *certificate* of *ownership*, which obtained in common parlance the name of *a sea letter*, but did not operate as a passport. But in this I think they are mistaken. During all that period, sea letters (which were passports) were granted to unregistered vessels, and the passports under the act of *June* 1796, were what are commonly called *Mediterranean* passports, rendered necessary by our treaty with the Dey of *Algiers*, on the 5th of *September* 1795, by the fourth article of which, eighteen months were allowed for furnishing the ships of the *United States* with passports. The sea letters which operated as passports among the *European* nations, are print-ed in the *English*, *French*, *Spanish* and *Dutch* languages. But the *Mediterranean* passports are in the *English* language only, ornamented with an engraving, and indented at the top, so that the *Algerines* might easily distinguish them by the eye, and by an examination of the indented part. Mr. *Dal-las's* argument has thrown light upon the subject of *passports and sea letters*. From a careful examination of the acts and papers to which he referred, I am satisfied that his view of the subject was correct. The result of all this is, that when the insurance in question was made, the brig *Rosina* was fur-nished with all the documents which an *American* unregis-tered vessel ought to have, and with all the documents neces-sary to protect her against the *European* belligerents. As to the *Algerines*, we were at peace with them. At any rate it is not to be supposed that danger from that quarter could have

OF PENNSYLVANIA. 469

been apprehended in a voyage from *New Orleans* to *Philadel-phia*, and therefore it is entitled to no consideration in the construction of the warranty. Upon the whole I am of opinion that the warranty was complied with, and therefore judgment should be entered for the plaintiff.

1813.

GRIFFITH
*v.*
Ins. COMPANY
of
N. AMERICA.

Judgment for plaintiff.